<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

```
                                  :
LLOYD WELTON HATCHER, JR.,        :
                                  :
            Petitioner,           :        Civil No. 08-5370 (RMB)
                                  :
        v.                        :
                                  :
MICHELLE R. RICCI, et al.,        :              OPINION
                                  :
            Respondents.          :
                                  :
```

This matter came before the Court upon Petitioner's filing
of a 28 U.S.C. § 2254 application.  Petitioner was notified of
his <u>Mason</u> rights, after which Respondents were directed to submit
their answer,[1] and Petitioner responded by filing his traverse.

For the reasons detailed below, the Petition will be denied,
and no certificate of appealability will issue.

**I.   STANDARD OF REVIEW**

Section 2254(a) gives the court jurisdiction to entertain a
habeas petition challenging a state conviction or sentence only
where the inmate's custody violates federal law:

    [A] district court shall entertain an application for a
    writ of habeas corpus in behalf of a person in custody

---

[1]  Although the Court directed Respondents to submit the
relevant record electronically, <u>see</u> Docket Entry No. 9, at 4,
Respondents submitted the same in hard copy.  The hard copy
record is on file with the Clerk.  The Court also extended the
time for Respondents to answer numerous times.  Indeed, on
November 18, 2009, the Court issued an Order to answer, under
pain of sanctions.  See Docket Entry No. 14.

pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); 28 U.S.C. § 2254(a); accord Barry v. Bergen County Probation Dept., 128 F.3d 152, 159 (3d Cir. 1997). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." Smith v. Phillips, 455 U.S. 209, 221 (1982). "If a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable. It is unnecessary in such a situation to inquire whether the prisoner preserved his claim before the state courts." Engle v. Isaac, 456 U.S. 107, 120 n.19 (1982). "[E]rrors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause." Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997). Moreover, "it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim." Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997) (citation omitted); see also Smith v. Zimmerman, 768 F.2d 69, 71, 73 (3d Cir. 1985).

A district court must give deference to determinations of state courts. Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.),

2

cert. denied, 534 U.S. 919 (2001); Dickerson v. Vaughn, 90 F.3d
87, 90 (3d Cir. 1996).  Federal courts "must presume that the
factual findings of both state trial and appellate courts are
correct, a presumption that can only be overcome on the basis of
clear and convincing evidence to the contrary."  Stevens v.
Delaware Correctional Center, 295 F.3d 361, 368 (3d Cir. 2002).
Where a federal claim was "adjudicated on the merits" in state
court proceedings, § 2254 does not permit habeas relief unless
adjudication of the claim

> (1)   resulted in a decision that was contrary to, or
>       involved an unreasonable application of, clearly
>       established Federal Law, as determined by the
>       Supreme Court of the United States; or

> (2)   resulted in a decision that was based on an
>       unreasonable determination of the facts in light
>       of the evidence presented in the State court
>       proceeding.

28 U.S.C. § 2254(d).

A decision is "'contrary to' a Supreme Court holding if the
state court 'contradicts the governing law set forth in [the
Supreme Court's] cases' or if it 'confronts a set of facts that
are materially indistinguishable from a decision of th[e Supreme]
Court and nevertheless arrives at a [different] result."
Rompilla v. Horn, 355 F.3d 233, 250 (3d Cir. 2004) (quoting
Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

Under the "'unreasonable application' clause, a federal
habeas court may grant the writ if the state court identifies the

correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413.  Whether a state court's application of federal law is "unreasonable" must be judged objectively; an application may be incorrect, but still not unreasonable.  <u>See id.</u> at 409-10.

A court begins the analysis by determining the relevant clearly established law.  <u>See Yarborough v. Alvarado</u>, 541 U.S. 652, 660 (2004).  Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." <u>Williams</u>, 529 U.S. at 412.  A court must look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71, 72 (2003).

## II. <u>BACKGROUND</u>

The Superior Court of New Jersey, Appellate Division, summarized the facts underlying Petitioner's conviction as follows:

> A seventeen-year old victim was asleep on a couch in her den when she was awakened by a person choking her. She fell off the couch to the ground.  Someone ripped off her T-shirt and taped her eyes and hands with duct tape.  She heard someone rummaging through her kitchen drawer where plastic baggies were kept.  The victim was then vaginally and anally penetrated with a baggie used as a crude condom.  Later, she was able to maneuver the tape so that she could see somewhat.  She observed two people.  One was a stranger, while the other was

4

> [Petitioner], her mother's boyfriend.  The victim
> clearly identified [Petitioner] when she saw him,
> through the duct tape, cleaning her vagina and legs
> with vinegar and water.  Other physical and scientific
> evidence, including hair samples, tied [Petitioner] to
> the crime.  Proof of [Petitioner's] guilt was quite
> strong.  As the trial judge noted, "[n]o one who sat
> through that trial would have believed anything but
> that the victim was telling the truth."

Resp's Ex. 9, at 4.[2]

Petitioner's counsel on direct appeal submitted a brief
raising nine grounds, referred to as "points" (with one of such
points consisting of two sub-points), and produced voluminous,
repetitive documents, much of the submission being an "everything
but the kitchen sink" approach.  See Res's Ex. 7.[3]

---

[2] Petitioner's conviction was his third conviction on the
charges of a sexual nature.  While Petitioner's first set of
charges (alleging assault and intent to commit rape) were
dismissed, he was then convicted on charges that included, inter
alia, aggravated sexual assault (stemming from Petitioner being
caught by police in the act of raping a seventy-six-year-old
woman whom Petitioner also physically assaulted), and -- upon
being released from prison -- was convicted again, pleading
guilty to an amended charge of lewdness (upon being charged with
endangering the welfare of a child as a result of Petitioner's
making sexual advances and kissing the fourteen-year-old younger
sister of the victim of the rape underlying Petitioner's instant
incarceration).  See Resp's Ex. 14, Avenel Report at 2.

[3] Specifically, Petitioner's appellate counsel asserted the
following nine grounds: (1) the prosecutor committed acts of
misconduct, e.g., when the prosecutor used the personal pronouns
such as "I" or "my" during her opening statement and summation
(instead of utilizing such terms as "the State" or "the
State's"); (2) the trial court erred in denying entry of
judgement of acquittal; (3) the trial court erred in limiting
cross-examination of State witnesses (e.g., by denying request to
recall the victim to the stand upon the defense learning that the
victim had a criminal record), hence upsetting defense counsel's
hope that the victim might perjure herself upon recall by denying

The Appellate Division affirmed Petitioner's conviction by concluding that all points raised on appeal (short of the ineffective assistance of counsel argument) were of such quality that they were suited for dismissal without discussion.[4]  See Resp's Ex. 9, at 3.  As to the remaining argument (asserting ineffective assistance of counsel), the Appellate Division observed that such argument should have been raised during post-

_____

that she had a criminal record, which -- the counsel allegedly had hoped -- might help him to discredit the State's case; (4) the trial court erred  in "precluding [Petitioner] from presenting a defense" (by, e.g., precluding the victim's mother from testifying that, on the night prior to the morning of the crime, the victim's mother and Petitioner "only engaged in oral sex [rather than 'full sexual intercourse'] because [Petitioner] was not feeling well"), hence upsetting Petitioner's hope to suggest to the jury that Petitioner's stomach condition not only protracted until the next morning (when the rape was committed) but also rendered Petitioner unable to penetrate the victim; (5) the trial court erred by "injecting bias into the trial" (e.g., by pointing out that certain statements made by defense counsel lacked foundation, or by reminding the defense counsel that his questions were already answered by the witness, or by directing the jurors to ignore an inappropriate comment, or by asking Petitioner and his counsel to not confer during the jury instructions so audibly as to disturb the instructions); (6) the trial court erred by "denying [Petitioner] a new trial" (this "argument" merely repeated the conclusions stated in support of judgement of acquittal); (7) Petitioner was denied effective assistance of trial counsel (stating no facts in support of that bold contention); (8) the "cumulative effect of the errors . . . rendered the trial unfair"; and (9) Petitioner's sentences should have not been imposed consecutively.  See Resp's Ex. 7.

    [4]  The Appellate Division corrected Petitioner's sentence, seemingly to Petitioner's satisfaction: the issue of Petitioner's sentence is not before this Court.  See Resp's Ex. 9; Docket Entry No. 1.

conviction relief ("PCR") proceedings and, thus, did not reach that issue.  See id. at 3, 5.

Having certification as to his direct appeal denied by the Supreme Court of New Jersey, Petitioner initiated his PCR proceedings.  Petitioner submitted a pro se PRC brief that essentially mirrored his appellate counsel's broad approach.  See Resp's Ex. 14 (raising "Point One," consisting of two sub-points (which, in turn, consisted of eleven sub-sub-points) and "Point Two" (consisting of four sub-points) but omitting to elaborate on the factual basis for Petitioner's conclusions).  Petitioner's PCR counsel, too, submitted a brief; that brief raised only one point, i.e., that Petitioner's trial counsel was ineffective. See Resp's Ex. 16.  Unlike Petitioner's pro se submission, the PCR counsel's argument was brief (consuming only two pages, double-spaced) and read, in relevant part, as follows:

> [P]etitioner asserts that his trial counsel failed to fully and properly investigate the matter at hand. Specifically, [P]etitioner asserts that counsel failed to interview Doctor Kevin J. Riordan (emergency room physician), officers that participated in the search warrant, namely, Officer James Bartleson, Officer Butch Hamer, Detective Richard McHale, Sgt. Marie Hayes. Petitioner also claimed that counsel failed to interview Lillian Easley, the victim's aunt.  In addition, [P]etitioner asserts that he was not in receipt of the log account record of the crime scene photographs not all of the crime scene photographs that were developed.  Also, [P]etitioner claims that he was not in receipt of the forensic lab report log records regarding the DNA sample taken, nor was John T. Nichols, a scientist, subpoenaed to testify. Petitioner asserts that his trial counsel failed to challenge the admissibility of the State's laboratory

analysis by failing to call certain key witnesses,
challenging the chain of custody and not having in his
possession log records.  This case involved one of the
most serious charges under the New Jersey Criminal
Code, and particular attention should have been given
to the potential pitfalls in the State's case.

Resp's Ex. 16, at 4-5.

The Law Division examined Petitioner and his PCR counsel's

submissions, held a hearing and denied Petitioner PCR relief in

an order omitting to elaborate on the grounds for the ruling.[5]

See Resp's Ex. 18.  An appeal followed.  During that appeal,

Petitioner, again, submitted a pro se application.  See Resp's

Ex. 21 (repeating, in addition to the arguments stated in

Petitioner's pro se brief presented at the Law Division level,

certain statements made by his PCR counsel, while simultaneously

entering Petitioner's conclusions potentially contradicting other

statements made by his PCR counsel, for example, by stating that

"Lillian M. Easley [did, indeed, testify, but] provided [a]

completely coerced and fabricated testimony due to trial

counsel['s] failures").

Petitioner's PCR appellate counsel also submitted a brief,

asserting: (1) the prosecutor's misconduct (referring,

specifically, to the prosecutor's decision to turn off the lights

in the courtroom during the testimony when the victim's ability

to see in the dark through the opening in the duct tape was

---

[5] It appears that the rationale underlying the decision of
the Law Division judge was expressed during the hearing.

8

questioned); and (2) ineffectiveness of Petitioner's trial

counsel.  See Resp's Ex. 19, at 22-24.

The Appellate Division affirmed the decision of the Law

Division and denied Petitioner PCR relief, observing as follows:

> [Petitioner] asserts that trial counsel did not provide
> effective assistance in his defense.  He alleges that
> trial counsel failed to meet with him prior to trial,
> failed to conduct an investigation of potential state
> witnesses as to bias or ability to observe, failed to
> review photographs, failed to cross-examine a witness
> as to her prior convictions or drug use, failed to
> interview or call an expert witness, failed to
> interview or call a police officer as a witness at
> trial, failed to file a motion to suppress evidence,
> allowed the introduction of false or perjured testimony
> at trial, and failed to object to conduct by the
> prosecutor at trial.  The trial judge dismissed the
> petition.  She found that defendant presented no more
> than a list of omissions by trial counsel.
> Accordingly, he failed to raise a prima facie case that
> any omission or combination of omissions caused
> prejudice to defendant.  The judge also found that the
> specific act of prosecutorial misconduct asserted by
> defendant, turning off the lights during trial to
> simulate what the victim could see with duct tape
> applied to her eyes, "was not something highly
> prejudicial."  She conceded it was a "dramatic way" of
> depicting the victim's situation but did not cause
> prejudice to [Petitioner].  . . .  There is a strong
> presumption that counsel rendered adequate assistance
> and made all significant decisions in the exercise of
> reasonable professional judgment.  [See] Strickland [v.
> Washington], 466 U.S. at 689.  Further, because
> prejudice is not presumed, . . . [Petitioner] must
> demonstrate how specific errors of counsel undermined
> the reliability of the proceeding.  [See] United States
> v. Cronic, 466 U.S. 648, 659 n. 26 (1984).  . . .
> Here, [Petitioner] enumerates many omissions by trial
> counsel but fails to articulate what trial counsel
> would have learned if he had examined photographs,
> interviewed certain witnesses, or conducted further
> interviews with defendant.  In short, [Petitioner] has
> failed to demonstrate how specific errors undermined
> the reliability of the verdict.

Resp's Ex. 4-5.

Upon denial of certification by the Supreme Court of New Jersey as to his PCR application, Petitioner filed the Petition at bar, executing it in the style largely similar to the one employed by Petitioner during his state proceedings and, hence, producing a rather lengthy and rambling submission (_i.e._, consisting of eight grounds, with numerous "sub-" and "sub-sub-" grounds within each ground).  See _generally_, Docket Entry No. 1.

III. **ANALYSIS**

    **A.**    **CHALLENGES TO COUNSEL'S PERFORMANCE (IN "POINT ONE")**

        **1.**    **Applicable Legal Test**

The "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), is the standard for ineffective assistance of counsel as enunciated in _Strickland v. Washington_, 466 U.S. 668 (1984).  Under _Strickland_, a petitioner seeking to prove a Sixth Amendment violation must demonstrate that his counsel's performance fell below an objective standard of reasonableness, assessing the facts of the case at the time of counsel's conduct.  See _id._ at 688-89; _Jacobs v. Horn_, 395 F.3d 92, 102 (3d Cir. 2005), _cert. denied_, _Jacobs v. Beard_, 546 U.S. 962(2005); _Keller v. Larkins_, 251 F.3d 408, 418 (3d Cir. 2001).  Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." _Strickland_, 466 U.S. at 688.

10

"In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."  Id.  The Supreme Court further explained:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Id. at 689 (citations omitted); see also Virgin Islands v. Wheatherwax, 77 F.3d 1425, 1431 (3d Cir. 1996).

If able to demonstrate deficient performance by counsel, the petitioner must also show that counsel's substandard performance actually prejudiced his defense.  See Strickland, 466 U.S. at 687.  Prejudice is shown if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.  The reviewing court must evaluate the effect of any errors in light of the totality of the evidence.

11

See id. at 695-96.  Thus, the petitioner must establish both
deficient performance and resulting prejudice in order to state
an ineffective assistance of counsel claim.  See id. at 697; see
also Jacobs, 395 F.3d at 102; Keller, 251 F.3d at 418.

Although this is a high burden for a petitioner to satisfy,
it is even higher for a petitioner proceeding under the AEDPA:

> For [a petitioner] to succeed, … he must do more than
> show that he would have satisfied Strickland's test if
> his claim were being analyzed in the first instance,
> because under § 2254(d)(1), it is not enough to
> convince a federal habeas court that, in its
> independent judgment, the state-court decision applied
> Strickland incorrectly.  Rather, he must show that the
> [state court] applied Strickland to the facts of his
> case in an objectively unreasonable manner.

Bell v. Cone, 535 U.S. 685, 698-99(2002) (internal citation
omitted).

### 2. **Petitioner's Challenges Are Without Merit**

Petitioner's instant Point One (bearing heading, "[t]rial
counsel was ineffective when he failed to investigate and
adequately prepare to and during the trial") is subdivided into
"A" and "B" sub-points (with sub-point "A" being then broken into
sub-sub-points "A" and "A-1," with both of these sub-sub-points
being further broken into non-numerated sub-sub-sub-points.
Moreover, the sub-sub-point "A-1" effectively asserts challenges
to the prosecutor's conduct, upon conclusion of which the sub-
point "B" resumes challenges to the performance of Petitioner's
trial counsel, and then "Point II" resumes challenges to the

prosecutorial conduct, and so on). <u>See</u> Docket Entry No. 1, at 10-21.

### a.   Petitioner's Contact with His Counsel

The aforesaid sub-point "A" opens with the assertion that Petitioner's counsel's performance failed the constitutional requirements because the trial counsel met with Petitioner only for 20 minutes during the year preceding the trial; Petitioner adds to this statement his factless conclusion that the counsel "did not have full discovery - photographs + records: the initial laboratory report and examinations were not started [presumably, at the speed Petitioner preferred, and a certain unspecified] fact sheet and discovery of material germane to [Petitioner's] trial 'direct' via-phone contact almost impossible." <u>Id.</u> at 10. While the Court is not entirely clear as to the meaning of this sentence, the Court gathers that Petitioner would have preferred: (a) more time with his counsel; and/or (b) being availed to copies of more documents examined by his counsel; and/or (c) counsel's speedier start of discovery processes. However, Petitioner's expression of his preferences neither establishes nor even explains why the counsel's performance, as rendered, fell below the standard of reasonableness and, in addition, undermined Petitioner's defense. While Petitioner's statements indicate Petitioner's belief that -- had Petitioner "supervised" his counsel closer -- Petitioner would have guided his counsel to

13

a more successful/speedier defense, that belief (and even a
hypothetical possibility that Petitioner's deeper engagement
would have actually improved Petitioner's defense) cannot
transform counsel's performance into a constitutionally deficient
one: the test posed by Strickland turns neither on the litigant's
subjective impression as to his legal abilities nor on the
possibility of the litigant's "betterment" of his defense: the
test asks if the performance, as rendered, was unreasonable and,
in addition, materially prejudiced the litigant's case.

    Here, Petitioner failed to assert any fact meeting even the
first prong of Strickland; that conclusion applies with equal
force to Petitioner's assertion that he would have preferred more
time with his counsel, or that he would have preferred for his
counsel to start copying Petitioner on every piece of paper that
counsel obtained (or produced as work product), or that
Petitioner would have preferred a speedier start to (or a broader
scope of) his counsel's investigative activities.  Simply put,
Petitioner does not explain what was omitted, delayed or left
unexamined by his counsel, and why these actions made counsel's
performance fall below the standard of reasonableness and, in
addition, prejudiced Petitioner.  See, e.g., Strickland, 466 U.S.
at 690-91; see also Adams v. Balkcom, 688 F.2d 734, 740 (11th
Cir. 1982) (examining Strickland and concluding that counsel is
not required to pore over every document which the government

might introduce into evidence, since preparation of a defense

turn on the particular facts and circumstances of each case);

Nelson v. Estelle, 642 F.2d 903, 906 (5th Cir.1981) (same);

accord Conklin v. Schofield, 366 F.3d 1191, 1202 (11th Cir. 2004)

(applying Strickland to conclude that the shortness of the

attorney-client communication cannot operate as a dispositive

factor as to the effectiveness of counsel's performance); Glover

v. Miro, 262 F.3d 268 (4th Cir. 2001) (same); United States v.

Rogers, 769 F.2d 1418, 1425 (9th Cir. 1985) (same); Fuller v.

Sherry, 2009 U.S. Dist. LEXIS 69571 (E.D. Mich. Aug. 7, 2009)

(same); Trevino v. Evans, 521 F. Supp. 2d 1104 (S.D. Cal. 2007)

(same); Burnette v. Mitchell, 2006 U.S. Dist. LEXIS 5076

(W.D.N.C. Jan. 20, 2006) (same); Cage v. Newland, 1999 U.S. Dist.

LEXIS 18553 (N.D. Cal. Nov. 20, 1999) (same).[6]

---

[6] Cf. Zeyon v. Pitkins, 2010 U.S. Dist. LEXIS 31933 (E.D.
Pa. Feb. 26, 2010) (relying on Hummel v. Rosemeyer, 564 F.3d 290,
297-98 (3d Cir. 2009), for the observation that attorneys might
be obligated to comply with reasonable -- from the American Bar
Association Standards for Criminal Justice point of view --
requests made by clients as to being furnished with  copies of
the documents provided to/examined by their counsel).  Here, in
contrast, Petitioner' sub-sub-point "A" did not assert a single
instance when he requested any particular document from his
counsel but, in response, was denied copies of those materials.
When Petitioner's challenges to performance of his counsel resume
in sub-point "B", Petitioner asserts, inter alia, that -- during
his initial meeting with his counsel -- he requested a "face-fact
sheet," without explaining the nature of the document Petitioner
had in mind, but stating that his counsel never obtained a copy
of that document.  Since it appears self-evident that counsel
could not copy Petitioner the document counsel did not receive,
the Court will address Petitioner's challenges based on the scope
of his counsel's discovery upon the Court's examination of

In light of the foregoing, Petitioner's first sub-sub-point in the sub-point "A" does not merit habeas relief.

### b.   Assertion As to the Need for Expert

The next statement included in Petitioner's sub-point "A" informs the Court of Petitioner's opinion that his counsel "failed to call and produce at trial expert witnesses."  <u>See</u> Docket Entry No. 1, at 10-11.

Petitioner explains that his hope was to assert to the jurors that, since in the evening (preceding the morning of the rape underlying Petitioner's conviction), Petitioner elected to engage "only" in oral sex -- instead of in an unspecified "full intercourse" -- with the victim's mother, and that he made such election because of a stomachache allegedly suffered by Petitioner during that evening, Petitioner should have been presumed unable to engage in the victim's rape the next morning. <u>See</u> <u>id.</u> at 11; Resp's Ex. 7. Petitioner, apparently, wished the victim's mother to so opine.  <u>See</u> Docket Entry No. 1, at 11.

The Petition explains (and the record supports this assertion) that Petitioner's trial judge precluded such testimony of the victim's mother (while allowing the victim's mother to

---

Petitioner's sub-sub-point "B" challenges, <u>infra</u>.  However, in the event Petitioner referred to the portion of the search warrant (detailing the facts underlying the issuance of the warrant) as "face-fact sheet," the Court notes, in passing, that the search of Petitioner's house was executed with ample probable cause.  <u>See</u> Resp's Ex. 14, "Offense Information."

testify as to a multitude of other matters) on the grounds that only an expert could enter an opinion correlating Petitioner's alleged stomachache and his election in favor of oral sex during an evening to his capacity or incapacity for vaginal/anal sex hours later.  See id.  Upon stating the gist of his trial judge's evidentiary ruling, Petitioner proceeds to two, mutually exclusive, conclusions, namely: (a) that no expert testimony should have been required; but, nonetheless, (b) that his counsel should have somehow foreseen that the judge would arrive to the aforesaid evidentiary ruling and, thus, his counsel failed to comply with the guarantees of the Sixth Amendment because of counsel's failure to predict the court's ruling and to obtain and produce an expert who would introduce the very testimony that Petitioner wished to offer to the jurors.

The former assertion (i.e., that no expert testimony should have been required) is not an allegation challenging the performance of Petitioner's counsel; it is a challenge to the decision rendered by the trial judge, and hence it could not violate Petitioner's Sixth Amendment rights.[7]

---

[7]  Although such challenge is not before this Court, the Court notes, in passing, that: (a) as a general rule, federal habeas corpus review is not available to adjudge the correctness of a state court evidentiary ruling, see Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); and (b) Petitioner's trial judge's decision that the correlation between Petitioner's condition/sexual election during the evening before rape and his condition/
sexual abilities on the morning of rape could be assessed, if at

Turning to Petitioner's challenge to the performance of his counsel, the Court is not entirely clear as to why Petitioner asserts that his counsel was ineffective by not calling an expert witness in light of his assertion that no expert testimony were needed: the Sixth Amendment does not require attorneys to be clairvoyants.  Thus, for this reason alone, Petitioner's challenge should be dismissed as without merit.

Moreover, Petitioner's assertion is without merit because: (a) in order to make a correlation desired by Petitioner, the expert would have needed an evidentiary foundation verifying Petitioner's stomachache (and the magnitude of it), but such foundation was not established; (because Petitioner, the only person undoubtedly qualified to describe his stomach pain sensation, elected not to testify in his own defense) and (b) even if such foundation had been laid, Petitioner offers this Court no fact suggesting that an admissible expert opinion of the type desired by Petitioner could, at least theoretically, be proffered under the requirements posed by the rules of evidence.[8]

---

all, only by an expert was sound under the rules of evidence and did not violate Petitioner's constitutional rights.

[8] It appears that Petitioner is of the opinion that his counsel could obtain an expert witness to enter *any* opinion Petitioner wished the jurors to hear.  If so, Petitioner errs. The rules of evidence are quite strict, and they require that an expert testimony be based on a *reliable methodology* and on the *data/conclusions well-accepted in the relevant industry* (here, the medical field).  See Kemp v. State, 174 N.J. 412 (2002) (addressing state Rule of Evidence 702); accord Kumho Tire Co.,

On the contrary, it appears highly unlikely that Petitioner's counsel could have obtained, even validly proffered, an expert opinion supporting the conclusion Petitioner wished to offer to the jurors.  Thus, Petitioner's counsel's decision appears to be a sound litigation strategy.  See Strickland, 466 U.S. at 690-91 (strategic choices made by counsel should not be second-guessed in hindsight).

Finally, even if the Court were to hold that such expert opinion could, somehow, have been found and offered, the decision of Petitioner's counsel not to proffer such opinion appears, too, strategically sound.  A jury could easily have found that Petitioner's defense was not credible.  See Kates v. Moore, 2009 U.S. Dist. LEXIS 77000, at *89 (D.N.J. Aug. 27, 2009) (observing that "it is entirely proper [for the reviewing court] to engage in record-based speculation as to what counsel's strategy might have been" for the purposes of examining the "petitioner's attempt to disprove the existence of a possible sound strategy") (quoting Thomas v. Varner, 428 F.3d 491, 500 n.8 (3d Cir. 2005).

---

Ltd. v. Carmichael, 526 U.S. 137, 151-52(1999); Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597(1993).  Here, Petitioner does not draw the Court's attention to any source of medical knowledge (moreover, a well-established conclusion based on reliable methodology) suggesting, even vaguely, that one's ability to engage in oral sex while suffering of a certain stomachache could, somehow, lead to the one's inability to engage in other forms of sex hours later, when the pain subsides.

Therefore, this Court concludes that Petitioner's counsel's decision not to seek an expert opinion correlating Petitioner's evening stomachache and/or election in favor of oral sex to his ability/inability to commit rape hours later did not fall below the standard of reasonableness and, hence, did not violate even the first prong of the <u>Strickland test</u>.

### c.   Assertions As to Other Witnesses

The next series of Petitioner's assertions included in the sub-point "A" is based on his counsel's decision not to call, as Petitioner's witnesses, Doctor Kevin J. Roirdan ("Roirdan"), Detective Richard McHale ("McHale"), Office Butch Hamer ("Hamer") and Sergeant Marie Hayes ("Hayes").   <u>See</u> Docket Entry No. 12-14.

Specifically, Petitioner states that Roirdan "could have testified about a non-account of physical evidence or any force to victim's two private areas of sexual penetration," <u>i.e.</u>, that no rape (or, perhaps, that no intercourse of any kind) happened. <u>Id.</u> at 11.   However, the underlying record is unambiguous that the victim's account of the events was that the rape was committed with the use of actual/crude condoms that left no semen in her body, and that her genital area was not injured, and the bodily fluids and skin particles of her perpetrators were washed off with vinegar.   <u>See</u> Resp's Ex. 14, "Offense Information" sheet.   Moreover, the State, at no point, asserted that the victim's genital area was physically injured.   <u>See</u>, <u>e.g.</u>, Resp's

20

Ex. 30, at 150-52; compare id. at 158-59, and 171 (summarizing
the testimony of nurse Dougherty (that the victim suffered
physical injuries to her face, neck and legs, but not her genital
area) and reflecting on the evidence of the victim's blood on the
cushion).  Indeed, the events described by the victim -- and the
description of the investigation immediately following the
incident -- were as follows:

> On 04-27-98, Middle Township Police were dispatched to
> a report of a sexual assault.  Upon arrival they met
> with the victim [whose name is redacted, and] who told
> them she had been taped with duct tape and repeatedly
> raped by her mother's boyfriend, [Petitioner], and
> another male.  She explained that she had been sleeping
> when she felt someone grab her throat and tape her legs
> and arms together with duct tape.  She also stated they
> taped her eyes and around her head.  She states she was
> then drug across the floor and her feet were untaped.
> She goes on to explain that the suspects had sexual
> intercourse with her and washed her genital area with
> vinegar.  At that point, the victim could not see who
> was assaulting her as she had tape over her eyes.  She
> was able to move the tape slightly away from her eyes
> and she observed her mother's boyfriend, [Petitioner],
> wearing a camouflage jacket.  She gave a description of
> the other man but could not see his face to identify
> him.  The victim indicated she has a talking clock and
> knows they were in her house for several hours as she
> could hear the clock.  She claims she did not hear
> anything for a while and when her alarm went off, she
> felt they were gone.  She got up and threw on a
> sweatshirt and shoes and ran to a neighbor's house.
> The neighbor, Sandra Crawford, opened her door to find
> the victim hysterical stating she was raped by
> "Boogie", a nickname for [Petitioner].  Ms. Crawford
> called the victim's mother who was at work then called
> Police.  The victim was taken to the hospital to be
> examined.  Police asked the victim if the men had used
> condoms.  She stated she knew they used something but
> believed it to be plastic baggies.  She admitted that
> she could also smell the vinegar they were using.
> Police arrived at the victim's residence and found the

front door to be wide open.  While processing the crime
scene, [Petitioner] arrived with his mother [and] was
informed that he was under arrest and taken to the
Police Station.  Evidence found at the victim's home
included a used towel and a bottle of vinegar, both of
which the victim stated were used in the assault. . . .
Based on this information, Police executed a search
warrant on the residence of [Petitioner].  Police found
a roll of silver duct tape, rope, and electrical wire
and cords. Also found on the floor was a box of plastic
baggies. Police found a load of wet clothes in the wash
machine that included a camouflage coat which had been
described by the victim.  Police removed the coat from
the wash machine and found a balled up piece of silver
duct tape which had long brown hair attached to it
[that proved to by the victim's].  Found on the floor
next to the wash machine was an opened condom.  All
evidence was taken into custody at that time. . . .
[Petitioner] states he is innocent [claiming] that
there is no evidence to say he committed this offense.
He claims the doctor's report states there was no
evidence of sexual assault to the victim [in the sense
that there was no semen in the victim's genitals and
her genital area was washed of bodily fluids] so
[Petitioner is posing a rhetorical question] how can
you be found guilty of something that did not happen.

Resp's Ex. 14, "Offence Information" (executed in connection with
Petitioner's indictment).

Since the State's case was, at no point, based on the

assertion that there was evidence of *forced* penetration (or that

semen, or particles of the skin of the victim's perpetrators were

left in or around the victim's genital area), the decision of

Petitioner's counsel not to call Roirdan appears strategically

sound: Roirdan could neither contribute to Petitioner's defense

nor cast doubts on the qualitatively different physical and

testimonial evidence offered by the State.  Therefore, his

counsel's decision did not fall below the standard of

reasonableness.  See Strickland, 466 U.S. at 690-91; accord
Harris v. Carlton, 2007 U.S. Dist. LEXIS 17318, at *33 (E.D.
Tenn. Mar. 9, 2007) (pointing out that counsel has no right to
call witnesses where the testimony would be irrelevant,
repetitious, cumulative, or unnecessary, and citing Piggie v.
Cotton, 344 F.3d 675, 677 (7th Cir. 2003)).

Petitioner's assertions that his counsel's performance
violated Petitioner's constitutional rights because of counsel's
decision not to call McHale and Hamer as witnesses fare even
worse: these assertions are, effectively, limited to an
expression of Petitioner's hypothetical hope that these Officers
"could have g[iven] testimony against [the fact that] burglary
[took place} or [about] locations of other items."  Docket Entry
No. 1, at 12.  However, even if the Court were to disregard the
irrelevance of such hypothetical "evidence,"[9] Petitioner's hopes

---

[9] Petitioner's burglary charge was merged with his unlawful
restraint charge and, upon merger, Petitioner was sentenced to a
prison term of five year on the basis of these merged charges,
see Docket Entry No. 15-3; with the Appellate Division modifying
Petitioner's sentence to have his prison term based on the
aggravated sexual assault and the prison term for the merged
counts run concurrently.  That, in turn, means that Petitioner's
five-year sentence imposed on the basis of the merged charges
expired long before Petitioner's filing of the Petition, and this
Court is without jurisdiction to entertain any Petitioner's
challenges based on the charge of burglary or criminal restrain
since Petitioner is no longer "in custody," within the meaning of
(§ 2254 in-custody requirement, for the purposes of that five-
year sentence).  See 28 U.S.C. § 2254(a); see also Mays v.
Dinwiddie, 580 F.3d 1136 (10th Cir. 2009) (examining concurrent
sentences in light of Maleng v. Cook, 490 U.S. 488 (1989), and
concluding that, for the purposes of § 2254, the prisoner is not

that a certain "fishing expedition" by his counsel might have turned out favorable to Petitioner in no way establishes a basis to qualify Petitioner's counsel's performance as that falling below the standards of reasonableness. <u>See</u> <u>id.</u> Therefore, under the first prong of <u>Strickland</u>, these assertions, too, are subject to dismissal.

The Petition, then, switches to Petitioner's allegations based on his counsel's decision not to call Hayes as Petitioner's witness. <u>See</u> Docket Entry No. 1, at 13. Petitioner asserts that Hayes should have been called as his witness because she: (a) "failed to observe head[]hair on the items purportedly found by [the] lead detective"; (2) noticed only one sweatshirt and one underwear garment (while two sweatshirts and two undergarments were recovered); and (3) "held knowledge of each and every item photographed during the [execution of the search] warrant that has not been disclosed but developed."[10]  <u>Id.</u>  However, even if

---

"in custody" with regard to his/her shorter-termed concurrent sentences that have expired by the time the prisoner files his/her petition while being "in custody" under the lengthier and still-running sentence(s)).  In other words, the only conviction with regard to which this Court has jurisdiction to entertain Petitioner's challenges is the conviction for aggravated sexual assault that led to his currently-served life sentence.  Hence, for the purposes of the instant review, all witness' statements as to Petitioner's burglary are facially irrelevant.

[10]  Petitioner offers no affidavit from Hayes and does not direct the Court's attention to any document verifying that Petitioner's description of what Hayes observed or failed to observe and what she knew (or did not know) is true.  That, in and by itself, renders Petitioner's assertion as to what Hayes

the Court were to ignore the unreliability of Petitioner's conjecture, his statements -- at best -- indicate that Hayes' assessment of the evidence was not as complete, as the evidence has shown.  Thus, Hayes' testimony could have been more detrimental than advantageous to Petitioner's defense.[11] Therefore, the decision of Petitioner's counsel not to call Hayes as a witness appears strategically sound and in no event unreasonable.  See Strickland, 466 U.S. at 690-91; Piggie, 344 F.3d at 677; Harris, 2007 U.S. Dist. LEXIS 17318, at *33.


### d.   Assertions As to Cross-Examination

Petitioner's sub-point "A" continues with his assertion that his counsel was ineffective for failure to "properly cross-

---

knew or observed insufficient for the purposes of this Court's habeas review, since Petitioner is obligated to base his obligation on actual facts rather than his speculations.  See Wilson v. Kerestes, 2008 U.S. Dist. LEXIS 91428, at *17-33 (E.D. Pa. Nov. 5, 2008) (relying on Strickland and relevant Third Circuit law to provide a detailed and thoughtful discussion of a habeas litigant's obligation to state facts, limitations on discovery and evidentiary hearing).

[11]   Furthermore, Petitioner's reference to photographs of which Hayes, allegedly, knew of but which were not presented at trial does not provide the Court with any information as to what was depicted on these photographs and how they could have been helpful to Petitioner's defense.  While Petitioner invites the Court to conclude that non-presentment of any photograph automatically violates a defendant's Sixth Amendment rights, the Court declines Petitioner's invitation: the test posed in Strickland in no way makes such an odd requirement.

examine" the victim, Officer James Bartleson ("Bartleson"), Detective Paul Loefflad ("Loefflad") and Lillian Easley ("Easley").  <u>See</u> Docket Entry No. 1, at 15-18.  For instance, Petitioner asserts that his counsel failed to elicit from Bartleson a confession that Bartleson examined the area behind the victim's house for signs of forcible entry.  <u>See</u> <u>id.</u> at 15.  However, since Petitioner's burglary conviction falls outside this Court's jurisdiction, <u>see</u> <u>supra</u>, this Opinion, note 9, the issue of whether Bartleson did or did not examine the house for forcible entry, and whether Petitioner's counsel properly omitted exploring that issue is outside this Court's review.[12]

Moreover, while Petitioner asserts that his counsel was ineffective by not exploring the discrepancy between the victim's testimony and the testimony of another witness as to whether the window was opened or closed (or by not questioning the victim about additional -- crime-unrelated -- items in the victim's sink), these questions appear to be strategically omitted by Petitioner's counsel, since none of these questions would have had any relevance to the charge of aggravated sexual assault of which Petitioner was convicted.  In the same vein, Petitioner's counsel reasonably omitted examination of Loefflad about this particular open window (which, the Court notes in passing,

_____

[12]  Even if it were relevant, <u>i.e.</u>, to the issue of credibility, this does not rise to the level of a constitutional violation.

related to the charge of burglary falling outside this Court's
jurisdiction, <u>see</u> <u>supra</u>, this Opinion, note 9) and about these
additional items in the sink (that had no relevance to the
charges underlying Petitioner's conviction).  Analogously,
counsel's decision not to focus on: (a) the discrepancy in
Easley's pre-trial statements given to police officers as to
whether "a car came in [P]etitioner's driv[e]way" thrice or
twice; and (b) Easley's statement that -- at a particular point
in time -- it did not rain (while Petitioner believed it was
raining), and that Easley heard Petitioner "talking to his dog"
(while Petitioner asserts that his dog was dead) appears not only
strategically sound but plainly prudent: all these matter could
only confuse the jury, but none of these statements could have
had any support with regard to Petitioner's defense.[13]  <u>Accord</u>
<u>Goodman v. Superintendent Coleman</u>, 2010 U.S. Dist. LEXIS 19061,
at *26-27 (E.D. Pa. Jan. 22, 2010) (relying on <u>Strickland</u>, 466
U.S. at 689, and finding no constitutional violation where

---

[13]   It appears that Petitioner is of the opinion that, had
his counsel pointed out *any* discrepancies, no matter how minor or
how irrelevant to the crime at issue, in the testimonies of the
State's witnesses, the jurors would have automatically presumed
that the entirety of the State's witnesses' testimonies was not
credible.  While Petitioner may so believe, his belief is neither
true nor renders the strategic choices of his counsel deficient.
On the contrary, Petitioner's counsel was strategically sound in
focusing on the discrepancies material to the charged crimes.
<u>See</u>, <u>e.g.</u>, Resp's Ex. 30, at 160-63 (discussing the discrepancies
in the State's witnesses' testimonies that were highlighted by
Petitioner's counsel).

"[t]rial counsel . . . shared that, in his experience, once
useful evidence is obtained from a witness, further questioning
on the matter may diminish its evidentiary value").  Therefore,
Petitioner's challenges asserting insufficient cross-examination
fail to meet even the first prong of the <u>Strickland</u> test.

### e.   Insufficient/Delayed Discovery

Finally (after being interrupted by the sub-sub-point "A-1"
addressing prosecutorial conduct and, hence, discussed <u>infra</u>),
Petitioner's "Point One" resumes with his sub-point "B,"
asserting that Petitioner's counsel either obtained certain
documents too late (in the sense that Petitioner doubts that his
counsel had sufficient time to adequately examine this evidence)
or was exposed to them only during the trial.  <u>See</u> Docket Entry
No. 1, at 20.

However, even if the Court were to presume that Petitioner
is correct as to the fact of his counsel's delayed discovery of -
- or failure to familiarize himself with -- certain material,
Petitioner does not explain how that delay prejudiced his
defense.  For instance, while Petitioner states that his counsel
failed to examine the photographs of the "washroom items location
and condition," <u>see id.</u>, Petitioner does not explain how the
location of the wash machine would be relevant to the inculpatory
fact that the clothing of Petitioner and his mother (including
the described-by-the-victim Petitioner's camouflage coat with a

roll of duct tape in the pocket, and with the victim's hair attached to this roll) were found in the wash machine. Similarly, Petitioner does not explain why his counsel's alleged failure to timely obtain the victim's photographs or the laboratory report prejudiced his defense, since the photographs of the victim were consistent with the description of the victim's injuries, as testified to by nurse Dougherty, and the laboratory report established that the hair was the victim's (stating that there was only 0.2% chance that it could have belonged to another person of African-American population of the United States).

### f.   Overall Insufficiency of Challenges

The preceding discussion highlights the decisive shortcomings of Petitioner's challenges to the performance of his counsel.  Indeed, even if the counsel's delays in discovery or his failures to obtain certain material were presumed both true and failing below the standard of reasonableness, or the Court were to endeavor into doubting the soundness of the counsel's strategic choices, no statement made by Petitioner (and no fact in the voluminous record before this Court) suggests that Petitioner's challenges met the second prong of Strickland, 466 U.S. at 687.

For the purposes of habeas review, Petitioner is obligated to show prejudice, i.e., to establish "a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been different" in light of the totality of evidence presented during Petitioner's trial.  Id. at 694-96. In addition, Petitioner "must show that the [state court] applied Strickland to the facts of his case in an objectively unreasonable manner."  Bell, 535 U.S. at 698-99.

Here, the victim provided very detailed testimony identifying Petitioner as the perpetrator, and the physical evidence in her home, Petitioner's home, as well as accounts of the State witnesses corroborated her testimony with nearly striking precision.  Indeed, there is no doubt that, after knowing Petitioner as her mother's paramour, the victim was very familiar with Petitioner's appearance and was unlikely to misidentify him.  After being sexually assaulted, the victim ran to the neighbor's house, and the victim's physical and emotional condition, same as the content of her excited utterances made to the neighbor were well established, as were the injuries to the victim's body.  The search of the victim's house and Petitioner's house produced extensive evidence corroborating the victim's account: the camouflage coat, duct tape with the victim's hair, vinegar, wash cloth, hair, Petitioner's shoe prints, scrub pad with the victim's hair (used by the perpetrators to remove the evidence off her body), etc. directly inculpated Petitioner. Jointly with the State's testimonial evidence, thus physical

30

evidence created a solid case.  Assessing the totality of evidence, as reflected by the record, this Court concludes that, even if the performance of Petitioner's counsel fell below the standard of reasonableness, which the Court does not conclude, the outcome of Petitioner's criminal proceeding would have been the same regardless of how Petitioner's defense was litigated. Therefore, the state court applied Strickland to the facts of Petitioner's case in a reasonable manner and duly dismissed his challenges based on performance of his counsel.  See  Bell, 535 U.S. at 698-99.

Consequently, Petitioner's multiple challenges to the performance of his counsel will be dismissed as not meriting habeas relief.[14]

### B.   PROSECUTORIAL CONDUCT (POINTS "ONE" AND "TWO")

Petitioner asserts that the prosecutor violated his rights in six different ways: (a) utilizing personal pronouns (such as "I" and "my") in her speech, referring the jurors to their personal life experiences and making observations resembling jury instructions, see Docket Entry No. 1, at 19 and 21-22; (b)

---

[14]  Petitioner's challenges asserting that his counsel was ineffective in failing to object to certain prosecutorial conduct will be addressed as the Court examines that conduct since -- if the prosecutor's conduct did not violate Petitioner's rights for the purposes of the Fifth and Fourteenth Amendment tests -- Petitioner's counsel's alleged failure to object to that conduct did not violate Petitioner's Sixth Amendment rights under the second prong of Strickland.

allowing the State's witnesses to provide what Petitioner believes to be perjurious testimony, see id. at 24-26; and (c) having an in-court demonstration as to removal of duct tape of one's skin, see id. at 19 and 27, and as to the feasibility of one's ability to see, in dim light, through a slim opening between one's facial skin and a duct-tape blindfold. See id.

### 1.   **Prosecutorial Statements**

#### a.   **Applicable Standard**

The Supreme Court has recognized the obligation of a prosecutor to conduct a criminal prosecution with propriety and fairness.

> He may prosecute with earnestness and vigor -- indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. . . . Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935), overruled on other grounds, Stirone v. United States, 361 U.S. 212 (1960).

"The line separating acceptable from improper advocacy is not easily drawn; there is often a gray zone.  Prosecutors sometime breach their duty to refrain from overzealous conduct by commenting on the defendant's guilt and offering unsolicited personal views on the evidence.  . . .  The prosecutor's vouching for the credibility of witnesses and expressing his personal

32

opinion concerning the guilt of the accused pose two dangers:
such comments can convey the impression that evidence not
presented to the jury, but known to the prosecutor, supports the
charges against the defendant and can thus jeopardize the
defendant's right to be tried solely on the basis of the evidence
presented to the jury; and the prosecutor's opinion carries with
it the imprimatur of the Government and may induce the jury to
trust the Government's judgment rather than its own view of the
evidence." United States v. Young, 470 U.S. 1, 7 and 18 (1985).

Under Supreme Court precedent, where a prosecutor's opening
or closing remarks are challenged in habeas, "[t]he relevant
question is whether the prosecutor's comments 'so infected the
trial with unfairness as to make the resulting conviction a
denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181
(1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)).
"Supreme Court precedent counsels that the reviewing court must
examine the prosecutor's offensive actions in context and in
light of the entire trial, assessing the severity of the conduct,
the effect of the curative instructions, and the quantum of
evidence against the defendant." Moore v. Morton, 255 F.3d 95,
107 (3d Cir. 2001).

### b.   Challenges Do Not Merit Habeas Relief

Here, Petitioner asserts that the prosecutor habitually used
terms "I" and "my" while addressing the jurors during her opening

statement and her summation (e.g., entering such introductory phrases as "I mean," "I hate talking about," "I suggest to you," "when I say," "I don't know," "I told you"), but the context of the prosecutor's statements indicates that her choice of words in no way created an improper suggestion or insinuation, or led to an impression of the prosecutor's personal knowledge of the information harmful to Petitioner but undisclosed to the jurors. Rather, the statements made by the prosecutor invariably reflected on the specific evidential matters carefully presented to the jurors.  Upon careful examination of Petitioner's trial transcripts, this Court was unable to find any situation where the pronouns selected by prosecutor offended the standard set forth in Young.

The same applies to the prosecutor's statements that could be construed as an invitation to correlate the jurors' personal experiences to the factual pattern presented by Petitioner's case.  At no point did the prosecutor invite the jurors to decide the case on passion and emotion.  Compare Viereck v. United States, 318 U.S. 236, 247 (1943) (prosecutor's statement to jury during World War II that "the American people are relying upon you . . . for their protection against this sort of crime, just as much as they are relying upon the men who man the guns" was an improper appeal to passion); United States v. Cunningham, 54 F.3d 295, 300-01 (7th Cir.) (prosecutor's statement to jury that

34

"collectively you can go back there and stop [the defendants].
You can make sure that [the victim] isn't going to get beat up
again.  Heaven forbid, for the witnesses that came in this
courtroom the last couple of days if these guys are found not
guilty.  Heaven forbid.  Don't let that happen," was improper
appeal to jury's emotions), cert. denied, 516 U.S. 883 (1995);
United States v. North, 910 F.2d 843, 895 (D.C. Cir. 1990)
(prosecutor's statement comparing defendant to Adolf Hitler was
improper appeal to passion), opinion withdrawn and superseded in
part on reh'q, 920 F.2d 940 (D.C. Cir. 1900) (per curiam order),
cert. denied, 500 U.S. 941 (1991).

Here, the prosecutor invited the jurors to draw from their
life experiences, but her statements did not bring in extraneous
or impermissible evidence into Petitioner's trial.[15]  See Wilson,
170 F.3d at 395 n.4; accord Moore v. Morton, 255 F.3d 95, 117,
n.21 (3d Cir. N.J. 2001) (citing Simpson v. Jones, 238 F.3d 399,
409 (6th Cir. 2000), for the observation that the prosecutor's
statement asking jurors to put themselves in shoes of murder
victim's family was not so prejudicial as to deny defendant right

---

[15]  Indeed, it was Petitioner's defense counsel who invited
the jurors to "put yourself in [Petitioner's] shoes."  See Resp's
Ex. 30, at 145-46 and 148.  That invitation by Petitioner's
counsel, in and by itself, provided a justification to the
prosecutor's invitation for the jurors to assess the evidence by
factoring in the jurors' personal experiences.  See Darden, 477
U.S. at 181-82 (in evaluating the likely effect of improper
comments, a court may consider whether the improper comments were
invited by or responsive to the comments by opposing counsel).

to fair trial in light of the language of the jury instructions
given that prompted the jurors to focus on the evidence actually
presented at trial).[16]  Moreover, the prosecutor's statements
appeared well in line with the trial court's jury instructions
similarly prompting the jurors to draw from their life
experiences.  <u>See</u> Resp's Ex. 30, at 195 (" You are expected to
use your own good common sense, consider the evidence for only
those purposes for which it has been admitted.  Give it a
reasonable construction in light of how people behave").

Analogously, the parts of the prosecutor's opening and
closing statements that referred to the jurors' obligation to
perform their duty neither injected prejudice into Petitioner's
trial nor contradicted the instructions the jurors received from
Petitioner's trial judge.  <u>See</u> Resp's Ex. 30, at 195-96
(replicating the trial court's instructions guiding the jurors,
<u>inter</u> <u>alia</u>, that "the verdict mus[t] represent the considered
judgment of each juror . . . It is your duty as jurors to consult
with one another and to deliberate with a view to reaching an
agreement, if you can do so without violence to individual

_____

[16]   Here, Petitioner's trial judge expressly guided the
jurors to "weigh the evidence calmly without passion, prejudice
or sympathy.  Any influence caused by these emotions has the
potential to deprive both the State as well as the defendant of
what you promised them, a fair and impartial trial by fair and
impartial jurors.  Speculations, conjecture, other forms of
guessing play no role in the performance of your duty."  Resp's
Ex. 30, at 175-76.

judgment.  Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.  In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion").[17]

The most constitutionally suspicious statement made by the prosecutor appears to be her last sentence in the closing statement.  See Resp's Ex. 30, at 174 (replicating the ending line of the prosecutor's summation, reading: "He did it.  He's guilty.  It's got to be your verdict.").  However, read in the context of the entirety of the prosecutor's summation which went, with extra care, through each piece of evidence presented by the State and by Petitioner's defense counsel, it is apparent that the prosecutor's closing line was offered as a summary of her review of this favorable- and unfavorable-to-the-State evidence rather than an attempt to unduly indoctrinate the jurors.[18]  See

_____

[17]  Moreover, the entire body of the detailed and very extensive jury instructions provided by the trial court facially superseded any statements made by the prosecutor and should have cleared any ambiguities as to how the jurors were expected to deliberate, which evidence they were expected to consider and in which manner, etc.  See Resp's Ex. 30, at 176-99.

[18]  A prosecutor has reasonable latitude to fashion closing arguments.  See United States v. Gray, 876 F.2d 1411, 1417 (9th Cir. 1989), cert. denied, 495 U.S. 930 (1990).  In cases where -- as it were during Petitioner's proceedings -- there are two conflicting stories, it may be reasonable to infer and argue that one of the two sides is lying.  See United States v. Laurins, 857 F.2d 529, 539-40 (9th Cir. 1988), cert. denied, 492 U.S. 906 (1989).  Petitioner's defense position was that no sexual assault

Resp's Ex. 30, at 148-74 (replicating the prosecutor's closing statement); compare id. at 148 (replicating Petitioner's counsel's closing statement ending with, "I submit to you and request from what you've heard and what you've seen and what you will do, that your verdict should [be] none other than not guilty of all counts," and inviting an equally strong counter-assertion by the prosecutor).

Assessing the totality of the underlying record, this Court concludes that, while the prosecutor's choice of language may have been imperfect, none of the prosecutor's comments infected the trial with such degree of "unfairness as to make the resulting conviction a denial of due process." Darden, 477 U.S. at 181; see also Brecht v. Anderson, 507 U.S. 619 (1993).

### 2.   Allegations Based on Witness' Alleged Perjury

Challenging the prosecutor's conduct, Petitioner, once again, focuses on his allegation that Officer Bartleson examined the area behind the victim's house for forcible entry but,

---

took place altogether, or that the assault was committed but not by Petitioner, see Resp's Ex. 30, at 156 (reflecting the prosecutor's frustration with the ambiguity of Petitioner's position: "I can't tell from [Petitioner's defense counsel's] opening statement, closing statement and the whole cross-examination . . . if [Petitioner's position is] that the sexual assault occurred or didn't occur.  I can't tell.  Sometimes he called it 'an unfortunate incident,' 'an unfortunate sexual assault,' 'this brutal crime,' and then other times it sounds like he's saying that [the victim] making it up").  Therefore, it was not unreasonable for the prosecutor to stress the State's reading of evidence that: (a) the crime was indeed committed; and (b) it was committed by Petitioner and his acquaintance.

allegedly, perjured himself on the stand by asserting that he did
not conduct such examination.  Petitioner asserts that the
prosecutor violated Petitioner's rights by allowing what
Petitioner believes to be perjurious testimony.  However, the
issue of Bartleson's observations (or lack thereof) relates to
Petitioner's burglary conviction that falls outside this Court's
jurisdiction, see infra, this Opinion, note 9, and -- even if the
Court were to ignore the jurisdictional bar -- Petitioner's
allegations would be subject to dismissal for lack of merit,
since Petitioner does not provide this Court with any factual
information suggesting that the prosecutor was actually aware of
-- but fostered -- Bartleson's perjury (that is, if the Court
were to presume that perjury was indeed committed).[19]  See

---

[19]  The same applies to Petitioner's allegations that Easley
committed perjury by: (a) giving different accounts to detective
during pre-trial investigation as to whether she heard a car
coming to Petitioner's house twice or thrice during the night
preceding the offence; (b) asserting that there was no rain at a
particular point in time during the rainy night of the victim's
rape; and (c) heard Petitioner calling his dog, while Petitioner
maintains that the dog was dead.  Even if the Court were to
presume that Easley committed perjury, and -- with a stretch --
to presume that these issues were material to Petitioner's
conviction on the sexual assault charges, the Court has not been
presented with any factual information suggesting that the
prosecutor knew that these details of Easley's testimony were
untrue.  It appears that Petitioner is of the opinion that the
sole fact of Petitioner's witnesses (e.g., the victim's mother)
submitting testimony contradicting the testimony of Easley
automatically renders Easley's testimony perjurious.  See Docket
Entry No. 1, at 26.  If so, Petitioner errs: contradictory
statements by witnesses do not necessarily rise to perjury and do
not impose constitutional liability upon counsel proffering these
contradicting testimonies.

Blalock v. Wilson, 320 Fed. App'x 396, 414 (6th Cir. 2009)
(elaborating on the rationale of the requirement to tie witness'
perjury to prosecutorial conduct and citing King v. Trippett, 192
F.3d 517, 522-23 (6th Cir. 1999) (noting that, '[t]o be entitled
to habeas relief, petitioner must show that the prosecution
knowingly used perjured testimony")); Burks, 512 F.2d at 224;
Norris v. Schotten, 146 F.3d 314, 331 (6th Cir. 1998) (stating
"Appellant has also presented no reason for this court to believe
that the prosecutors intentionally allowed  any witness  to
perjure  herself on the stand"); accord Hakeem  v. Beyer, 774 F.
Supp. 276, 287 (D.N.J. 1991) (dismissing factless assertion that
the prosecutor allowed witness perjury as too nebulous to merit
habeas relief), vacated on other grounds, 990 F.2d 750 (3d Cir.
1993) (reversing grant of habeas relief).

### 3.   **Allegations Based on In-Court Demonstrations**

During Petitioner's trial, the prosecutor conducted two
interrelated in-court demonstrations when she asked the
detectives: (a) to assess whether and what one would be able to
see in a dim of the courtroom (with the courtroom lights turned
off) through the cracks/sliver openings between the officer's
facial skin and the duct tape placed over the officer's eyes; and
(b) to remove this duct tape of the face and wrists.  Petitioner
maintains that these in-court demonstrations violated his rights
by unduly influencing the jurors' emotions (presumably, because

40

the jurors could better visualize the victim's ordeal and sympathize with her) and by misleading jurors as to the actual experiences suffered by the victim on the morning of her rape. See Docket Entry No. 1, at 19 and 27. Specifically, Petitioner maintains that the officer participating in these in-court demonstrations suffered less injury as a result of tape removal (than the injury the victim did or should have suffered) and was availed to a better opportunity to see than the victim had during her rape because, during the in-court demonstration, the duct tape was placed on the officer's face "higher" than it was placed on the victim during her sexual assault.[20]  See id.

In the event Petitioner wished to assert that the in-court demonstration was unreliable by being too different,

---

[20]  The most concerning aspect of Petitioner's assertion appears to be Petitioner's ability to *compare* the location of duct tape on the officer's face with the location of duct tape on the victim's face, as well as Petitioner's peculiar certainty that the irritation suffered by the victim's skin (as a result of having duct tape on her skin longer than the officer had it during the in-court demonstration) must have been more severe. Indeed, unless Petitioner offers an admission that he was present during the sexual assault on the victim, this Court is not clear as to how could Petitioner be in the position to assert that the duct tape on the victim's face was located "lower" than it was on the officer's face during the demonstration, or that the irritation of her skin was more severe. Simply put, if Petitioner maintains his innocence -- as he does for the purposes of the instance application -- Petitioner should be expected to entertain the possibility that the duct tape on the victim's face was located even higher than it was on the officer's face during the in-court demonstration, and there is no reason why Petitioner should not entertain the possibility that, being attached for a lengthier period of time than during the in-court demonstration, the duct tape could have become more lose on the victim's skin.

41

circumstantially, from the events as they were testified to by the victim, Petitioner's argument is not only without merit but also without logic: the jurors were exposed to the very same testimony by the victim that was heard by Petitioner, and the jurors were present during the very same in-court demonstrations that were witnessed by Petitioner.  Hence, if Petitioner noted a material incoherence between the facts testified to by the victim and the circumstances of the in-court demonstrations, his jurors were equally availed to making the same comparison and, hence, were at liberty not to credit the in-court demonstrations with reliability.

Moreover, legally, an in-court demonstration need not be a scientific test identically replicating the events as they took place; all that is required is a sufficient similarity.  See United States v. Birch, 39 F.3d 1089, 1092 (10th Cir. 1994) ("Defendant's argument that the demonstration here is similar to that found improper in Jackson v. Fletcher [647 F.2d 1020, 1026-28 (10th Cir. 1981)] fails.  In Jackson, the evidence at issue was testimony describing the results of an out-of-court re-enactment of a vehicle accident. . . .  Here, in contrast, the evidence consisted of an in-court demonstration . . . that was sufficiently similar to actual events to provide a fair comparison"); United States v. Menard, 1990 U.S. App. LEXIS 12070, at *3 (7th Cir. 1990) (same).  Since there is no doubt

42

that the in-court demonstrations were sufficiently similar to the events described by the victim, the procedural validity of these demonstrations is solidly established.

Furthermore, in the event Petitioner asserts that the prosecutor's decision to proceed with these in-court demonstrations introduced unduly inflammatory evidence into his trial, Petitioner's argument is equally without merit. For a habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial. See Keller v. Larkins, 251 F.3d 408, 413 (3d Cir.), cert. denied, 534 U.S. 973 (2001). Admission of highly relevant probative evidence cannot be deemed a violation of due process guarantees simply because the defendant fears that this evidence might have a prejudicial effect. See, e.g., Estelle v. McGuire, 502 U.S. 62, 70 (1991) (holding that the state court's admission in petitioner's trial for murdering his infant daughter of the testimony of two physicians that the child had suffered child abuse (evidence of rectal tearing that was six weeks old and rib fractures that were seven weeks old); cf. Rivera v. Illinois, 129 S. Ct. 1446, 1454 (2009) ("The Due Process Clause, our decisions instruct, safeguards not the meticulous observance of state procedural prescriptions, but the fundamental elements of fairness in a criminal trial") (citation and internal quotation

43

marks omitted); Alberni v. McDaniel, 458 F.3d 860, 864-66 (9th Cir. 2006); Watkins v. Meloy, 95 F.3d 4, 7 (7th Cir. 1996) ("If the evidence is probative, it will be very difficult to find a ground for requiring as a matter of constitutional law that it be excluded; and if it is not probative, it will be hard to show how the defendant was hurt by its admission").  Since nothing in the record indicates that the hypothetical prejudice accruing to Petitioner as a result of the in-court demonstrations was so great as to substantially outweigh any evidentiary value of these demonstrations, the Court cannot find that the prosecutor's decision to conduct these demonstration (and the trial court's allowance of them) violated Petitioner's due process right to fair trial. See Estelle, 502 U.S. at 68.

Consequently, Petitioner's challenges based on the conduct of -- and statements made by -- his prosecutor will be dismissed as not warranting habeas relief.

### C.    TRIAL COURT'S DECISIONS (POINTS "THREE" TO "SEVEN")

Petitioner's next five grounds are dedicated to his challenges to the decisions made by his trial judge. Specifically, Petitioner asserts that his trial judge wrongly: (a) denied Petitioner judgment of acquittal; (b) unduly limited Petitioner's counsel's cross-examination efforts; (c) precluded Petitioner from presenting his defense; (d) injected bias into Petitioner's trial; and (e) denied Petitioner new trial.  See

Docket Entry No. 1, at 280-34.  Petitioner's allegations to that effect continuously reiterate each other and, in addition, incorporate the arguments already stated in Petitioner's "Points One and Two."

For instance, Petitioner maintains that he should have been entitled to judgment of acquittal because he had an implied license to enter the house of the victim (and her mother, Petitioner's paramour) and, thus, could not have committed burglary,[21] and also because the victim did not "really" identify Petitioner, since she did not refer to him by his official name (presumably, as "Lloyd" or "Mr. Hatcher") when she ran, on the rainy morning of her rape, to the neighbor's house, crying and screaming that "Boogie" raped her (i.e., using Petitioner's nick-name utilized by the members of her family and by Petitioner's acquaintances).[22]  See id. at 28.

Proceeding to his claim that the trial judge unduly limited Petitioner's cross-examination, Petitioner asserts that the judge improperly prevented Petitioner's counsel from examination of

_____

[21]  However, the Court is without jurisdiction to review this challenge since Petitioner is not "in custody" under his burglary conviction.

[22]  Since the victim consistently identified Petitioner as her perpetrator during the pre-trial investigation and in court, the Court will not elaborate on Petitioner's assertion as it is facially meritless.

Easley as to her prior criminal conviction[23] and improperly put a stop on Petitioner's counsel's questions as to Easley's recollection that she heard Petitioner calling/talking to his dog, see id. at 29 (the issue having little or no probative value).  Petitioner also asserts that his counsel was improperly precluded from examining the victim as to her past sexual encounters, see id. at 29-30, even though such inquiries are expressly barred by the Rape Shield Law, a provision the constitutionality of which was established for the purposes of the Due Process Clause of the Fourteenth Amendment and the compulsory Process and Confrontation Clauses of the Sixth Amendment.[24]  See Michigan v. Lucas, 500 U.S. 145 (1991).

In the same vein, Petitioner maintains that the trial judge wrongfully precluded examination of: (a) Officer Bartleson about the "physical condition" of Petitioner on the morning of the

---

[23]  However, the evidence of Easley's criminal conviction was indeed *admitted and disclosed* to the jury, and Petitioner's trial judge also provided instructions to the jurors as to the proper use of that evidence.  See Resp's Ex. 30, at 181.

[24]  The statute, N.J. Stat. Ann. 2C:14-7a, is designed to "protect the privacy interests of the victim while ensuring a fair determination of the issues bearing on the guilt or innocence of the defendant." State v. Garron, 177 N.J. 147, 165 (2003), cert. denied, 540 U.S. 1160 (2004).  Its goal is "to deter the unwarranted and unscrupulous foraging for character-assassination information about the victim" and "does not permit introduction of evidence of the victim's past sexual conduct to cast the victim as promiscuous or of low moral character." Id.  Those concerns apply equally to a child-victim. See State v. Budis, 125 N.J. 519, 528 (1991).

sexual assault, <u>see</u> Docket Entry No. 1, at 30 (even though
Bartleson could offer only inadmissible speculative/hearsay
statements); and (b) Officer Webster about the "location of
Detective Loefflad when the ball of duct tape was recovered [from
the pocket of Petitioner's just-washed camouflage coat]," <u>id.</u>,
even though the exact location of Loefflad had little or no
probative value.

Switching to a more general claim, Petitioner reiterates,
again, his challenges to Easley's testimony and also re-asserts,
again, that he was denied an opportunity to present his defense
because his trial judge: (a) did not allow his paramour, a
layperson, to enter an opinion as to Petitioner's
ability/inability to conduct vaginal/anal intercourse hours after
having oral sex with her, and about the effect Petitioner's
alleged stomachache experienced on the evening preceding the
morning of the offense could have had upon Petitioner's sexual
abilities during that morning, and (b) did not allow questions as
to the victim's lack of *internal* injuries, even though the State
at no point asserted that *such* injuries occurred, hence conceding
the issue <u>ab initio</u>.  Petitioner supplements the foregoing by
assertions that the trial judge "unduly interrupted" his defense
counsel during direct and cross-examinations by making judicial
rulings, "unduly ended a sidebar conference" while Petitioner's
counsel, apparently, wished to further elaborate on his point,

and "unduly" broke the last day of Petitioner's criminal hearings for lunch, thus upsetting Petitioner's counsel's plans to deliver his summation uninterrupted.[25]   See id. at 31-32.

Then, Petitioner asserts that the trial judge unduly injected bias into Petitioner's trial; in support of that assertion, Petitioner reiterates, again, his claim that the judge unduly "interrupted" his counsel, and asserts -- without clarification -- that the judge wrongly "restricted [his] ability to communicate" by "unduly" directing Petitioner's counsel to focus on probative -- rather than irrelevant -- evidentiary matters.   See id. at 33.

Petitioner concludes this chain of challenges with a claim that his trial judge erred in denying him a new trial; in support of that contention Petitioner offers only his own opinion that the jurors entered his verdict against the weight of evidence. See id. at 34.

None of the aforesaid contentions has merit.

Petitioner's challenges based on the trial judge's decisions to limit the scope of certain examinations call for this Court's examination of the protections guaranteed by the Confrontation Clause.   The standard established by the Supreme Court provides:

---

[25]   Petitioner's counsel's summation was extremely lengthy, see Resp's Ex. 30, at 62-148 (i.e., almost three-and-a-half times longer than the prosecutor's summation, see Resp's Ex. 30, at 148-74, and almost three-and-a-half times longer than the trial judge's very detailed jury instructions.   See id. at 174-99.

48

> [t]he Confrontation Clause . . . guarantees the right
> of an accused in a criminal prosecution "to be
> confronted with the witnesses against him."  . . .
> [While] "the main and essential purpose of
> confrontation is to secure for the opponent the
> opportunity of cross-examination[,]'" [<u>Davis v. Alaska</u>,
> 415 U.S. 308, 315-16 (1974)] (quoting 5 J. Wigmore,
> Evidence § 1395, p. 123 (3d ed. 1940)), . . . [i]t does
> not follow . . . that the Confrontation Clause prevents
> a trial judge from imposing any limits on defense
> counsel's inquiry . . . ."  On the contrary, trial
> judges retain wide latitude insofar as the
> Confrontation Clause is concerned to impose reasonable
> limits on such cross-examination based on concerns
> about, among other things, . . . prejudice, *confusion
> of the issues, . . . or interrogation that is
> repetitive or only marginally relevant.* . . . "[T]he
> Confrontation Clause guarantees an opportunity for
> effective cross-examination, not cross-examination that
> is effective in whatever way, and to whatever extent,
> the defense might wish." <u>Delaware v. Fensterer</u>, 474
> U.S. 15, 20 (1985) (<u>per</u> <u>curiam</u>) . . . .

<u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 682-83 (1986) (original
emphasis omitted, alternative emphasis supplied).

Here, all rulings made by Petitioner's trial judge appear
well based on constitutionally valid rules of evidence and/or on
constitutionally sound state law limiting inquiries into prior
sexual activities of rape victims.  Therefore, the Court finds no
violation of Petitioner's rights.

Moreover, even if this Court were to hypothesize that a
certain ruling made by Petitioner's trial judge was not well
grounded in the relevant rules or statutory provisions,
Petitioner's claims would still have to be dismissed since
Confrontation Clause errors are subject to harmless error

analysis.[26]   See United States v. Reynolds, 171 Fed. App'x 961,
966 (3d Cir. 2006) (citing Van Arsdall, 475 U.S. at 684); United
States v. Al-Sadawi, 432 F.3d 419, 426 (2d Cir. 2005)); see also
United States v. Arriola-Perez, 137 Fed. App'x 119, 133 (10th
Cir. 2005), cert. denied, 546 U.S. 1097 (2006).   The Court's
examination of the record with regard to each and every
evidentiary ruling challenged by Petitioner failed to establish a
substantial and injurious effect of these rulings upon the
Petitioner's jury's verdict, hence rendering any hypothetical
error harmless.   Therefore, Petitioner's challenges based on his
trial judge's evidentiary determinations fails to merit habeas
relief.

    Petitioner's assertions that he was unduly denied judgment
of acquittal or that the jurors entered their verdict against the
weight of evidence are, too, without merit.

    A claim that the verdict is against the weight of the
evidence is essentially a matter of state law, and does not raise
a federal constitutional question unless the record is completely

---

    [26]   Evidentiary rulings are not subject to habeas review,
see supra, this Opinion, note 7, unless the particular ruling
"caused 'fundamental unfairness' in violation of due process."
Kontakis v. Beyer, 19 F.3d 110, 120 (3d Cir. 1994) (quoting
Lisenba, 314 U.S. at 236).   To determine if the evidence caused
fundamental unfairness, the Court must apply the harmless error
test. See id.   Under this test, an error is harmless if it did
not have "a substantial and injurious effect or influence in
determining the jury's verdict." Id. (quoting Brecht v.
Abrahamson, 507 U.S. 619, 638 n.9 (1993)).

devoid of evidentiary support in violation of the Petitioner's
due process rights.  See Cunningham v. Maroney, 397 F.2d 724, 725
(3d Cir. 1968), cert. denied, 393 U.S. 1045 (1969).  Only where
no rational trier of fact could have found proof of guilt beyond
a reasonable should a writ issue.  See Jackson v. Virginia, 443
U.S. 307, 324 (1979); Singer v. Court of Common Pleas, Bucks
County, 879 F.2d 1203, 1206 (3d Cir. 1989).  Factual issues
determined by a state court (jurors included) are presumed to be
correct, and the petitioner bears the burden of rebutting this
presumption by clear and convincing evidence.  See Werts v.
Vaughn, 228 F.3d 178, 196 (3d Cir. 2000) (citing 28 U.S.C. §
2254(e)(1)).

Here, the record is heavily laden with  evidence of
Petitioner's guilt.  Conversely, Petitioner fails to offer the
Court any evidence -- and, certainly, he offers no clear and
convincing evidence -- that any reasonable triers of fact would
be unable to find Petitioner guilty on the basis of the record
presently before this Court.  Therefore, Petitioner's claims
asserting wrongful denial of a verdict of acquittal or
Petitioner's entitlement to a conclusion that the jurors entered
their decision against the weight of evidence are without merit
and warrant no habeas relief.[27]

---

[27]  Petitioner's claim that he was improperly denied a
retrial (i.e., the claim which, it seems, was mechanically copied
by Petitioner from the briefs submitted by his state court

Petitioner's claims based on the alleged judicial bias fares even worse.

> Generally, a habeas petitioner seeking reversal of his conviction on due process grounds because of the trial judge's alleged bias must demonstrate that the judge was actually biased or prejudiced against the petitioner.  See Corbett v. Bordenkircher, 615 F.2d 722, 723-24 (6th Cir. 1980); Brinlee v. Crisp, 608 F.2d 839, 852-53 (10th Cir. 1979) . . . . However, as the Supreme Court has recognized, "not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.'"  Withrow v. Larkin, 421 U.S. 35, 47 (1975) (quoting In re Murchison, 349 U.S. at 136).  Accordingly, there are cases where "experience teaches that the probability of actual

prejudice on the part of the judge or decisionmaker is too high to be constitutionally tolerable."  Id.  For example, experience teaches that the probability of actual bias is too high where the judge has a pecuniary interest in the outcome of a trial or where the judge has been the target of personal abuse or criticism from the party before him.  Id. The test in determining if a judge's bias should be presumed in a particular case is whether, realistically considering psychological tendencies and human weaknesses, the judge would be unable to hold the proper balance between the state and the accused.  Tumey v. Ohio, 273 U.S. 510, 532; Withrow v. Larkin, 421 U.S. at 47; Taylor v. Hayes, 418 U.S. 488, 501 (1974).  In making this inquiry we, of course, presume the honesty and integrity of those serving as judges. Withrow v. Larkin, 421 U.S. at 47.

Dyas v. Lockhart, 705 F.2d 993, 996-97 (8th Cir. 1983).

Here, Petitioner offers -- as evidence of his trial judge's bias -- the facts that the trial judge was: (a) entering

_____

appellate counsel) is not cognizable in habeas review.  See Townsend v. Sain, 372 U.S. 293, 317 (1963) (setting limited exception factually inapplicable to the case at bar), superceded, in part, on other grounds, Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992) (superceded, in part, on other grounds by the ADEPA).

evidentiary rulings; (b) controlling the conduct of counsel; and (c) breaking the court sessions for lunch.  In other words, Petitioner is asserting that the judge violated Petitioner's rights by merely performing her judicial duties.  Since none of these allegations comes even remotely close to suggesting that Petitioner's trial judge was unable to hold the proper balance between the State and Petitioner, these challenges merit no habeas relief.  Petitioner's disappointment with losing his trial cannot operate as a valid basis for finding Petitioner's conviction constitutionally deficient.  Accord Currier v. Keisler, 2008 U.S. Dist. LEXIS 51757, at *8 (D.N.J. July 2, 2008) (observing that "Petitioner's disappointment with an outcome of [his proceedings] has no bearing on Plaintiff's due process rights" and citing Thrower v. N.J. Dep't of Corr., 2007 U.S. Dist. LEXIS 66252 (D.N.J. Sept. 6, 2007))

   **D.   CUMULATIVE ERROR ASSERTION (POINT "EIGHT")**

The Petition concludes with an assertion that Petitioner should be granted habeas relief because "cumulative errors" rendered his trial "unfair."  Docket Entry No. 1, at 34.  The applicable test for a "cumulative error" habeas claim is whether the overall deficiencies "so infected the trial with unfairness as to make the resulting conviction a denial of due process." See Hein v. Sullivan, 601 F.3d 897, 917 (9th Cir. 2010) (relying on Donnelly, 416 U.S. at 643); Thornburg v. Mullin, 422 F.3d

1113, 1137 (10th Cir. 2005) (similarly relying on <u>Donnelly</u>); <u>see also</u> <u>Fahy v. Horn</u>, 516 F.3d 169, 205 (3d Cir. 2008) ("Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice'") (quoting <u>Albrecht v. Horn</u>, 471 F.3d 435, 468 (3d Cir. 2006), which -- in turn -- quoted and relied on <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993)).

For the reasons set forth in the above discussion, the alleged "errors," when considered together, did not render the trial constitutionally flawed.  Therefore, any trial errors, to the extent they existed, did not prejudice Petitioner: his verdict was not unreliable and, thus, his "cumulative error" challenge fails to merit habeas relief.  <u>See</u> <u>Fahy</u>, 516 F.3d at 205.

**IV.   <u>CERTIFICATE OF APPEALABILITY</u>**

The Court denies Petitioner a certificate of appealability because Petitioner has not made "a substantial showing of the denial of a constitutional right" under 28 U.S.C. § 2253(c)(2). <u>See</u> <u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003).

54

**V.  <u>CONCLUSION</u>**

Based on the foregoing, the Court dismisses the Petition, with prejudice, and declines to issue a certificate of appealability, pursuant to 28 U.S.C. § 2253(c).

An appropriate Order accompanied this Opinion.

<u>s/Renée Marie Bumb</u>
Renée Marie Bumb
United States District Judge

Dated:<u> July 29, 2010</u>

55